**Larry Warren JACKSON, et al.**

v.

**Sheriff Mike GARDNER and Lon Boyd, County Executive.**

**No. CIV-2-84-263.**

United States District Court,
E.D. Tennessee,
Northeastern Division.

July 2, 1986.

Paul C. Doyle, Legal Services of Upper East Tenn., Penny J. White, Johnson City, Tenn., for plaintiffs.

William C. Bovender, Mark S. Dessauer, Kingsport, Tenn., for defendants.

## MEMORANDUM AND ORDERS

HULL, Chief Judge.

This is a 42 U.S.C. § 1983 case in which inmates of the Sullivan County Jail have challenged the constitutionality of the conditions of their confinement. By Order of April 4, 1986, this action was certified as a class action to be maintained on behalf of all inmates confined in the Sullivan County Jail and "workhouse". Through a series of pretrial and status conferences, discovery, and negotiation between the parties, the issues upon which proof needed to be taken were limited. Resolution of some of the conditions complained of occurred by way of settlement.[1] Other conditions have been admitted or stipulated as existing, leaving only the issues of overcrowding and fire safety for trial. Plaintiffs seek only injunctive relief in this action which came on for trial without intervention of a jury on June 25, 1986. After carefully considering the evidence in the record, the proof adduced at trial and the arguments and briefs of counsel, the Court makes the following findings of fact and conclusions of law:

The Sullivan County Jail houses both convicted inmates and pretrial detainees. As to pretrial detainees, "the proper inquiry is whether [the] conditions [of confinement] amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). One may not be "punished" in accordance with due process unless one has been adjudicated guilty of some offense. As to the convicted inmates, the appropriate standard is whether the conditions of confinement amount to cruel and unusual punishment.

The present Sullivan County Jail consists of a main facility adjacent to the Sullivan County Courthouse, and a smaller structure known as the "workhouse". The main facility is an antiquated[2] two-story structure which not only houses inmates, but provides office space for the Sullivan County Sheriff's Department. The "workhouse" is the old Sheriff's house. It is a two-story, mostly wood structure of some historical significance and a cause of great concern for seemingly everyone associated with Sullivan County principally because of fire safety concerns. The main facility con-

---

1. The defendants are to be credited for the many affirmative steps taken at the jail since the inception of this lawsuit.

2. This facility was built in 1955, but in terms of the demands placed upon it and the current standards in the field of corrections, it is sorely in need of renovation or replacement.

tains 122 bunks. The workhouse has 30 bunks. Total population at the jail as of the day of trial was 167. Obviously, there is a problem providing beds for all the inmates. According to the testimony of representative plaintiffs, inmates are often forced to sleep on the floors of the cells. Even when enough beds are available, the jail is still overcrowded.

Pictures of bunk areas in both the workhouse and the main facility reveal the fact that the Sullivan County Jail is unable to accommodate the number of prisoners for which they are responsible. There simply does not appear to be enough room for inmates to move about freely. Michael Jenkins, the state jail inspector from the Tennessee Corrections Institute[3] who has been responsible for inspection of the Sullivan County facility since 1981 testified that Sullivan County does not meet the State's minimum space requirement per inmate. The State requires the provision of at least 25 square feet per inmate. This requirement must be met, along with several others, for a county jail to receive state certification. The American Correctional Association's (A.C.A.) minimum standard is 60 square feet per inmate assuming that the inmate spends no more than ten hours per day locked into this area.[4] This was the minimum standard preferred by plaintiff's expert witness, Gordon Kamka, who possesses impressive credentials in the field of corrections management. The majority of those confined in Sullivan County live in cells which average little more than 20 square feet per inmate (this includes space in bunk areas and the adjoining day area) according to jail inspector Jenkins. This figure would decrease when the fact that the prisoners are locked into their bunk areas from approximately 9:00 p.m. to 7:00 a.m. is taken into consideration.

The cells in the main facility consist of three or four bunk areas side by side, which open into a common "day area". The day area contains a shower, toilet, sink, table mounted on the wall (actually a counter), and a bench. Each bunk area also contains a toilet and sink; however, the bunk areas are so cramped that the toilet is only a few inches from one of the bottom bunks. Pictures of these areas introduced by the plaintiffs reveal living conditions which could fairly be described as deplorable. Jail Administrator Lynn Hawkins testified that cleaning supplies were available to the inmates, and that it was basically just up to them whether they lived in clean, sanitary cells or not. Although sanitation is one of the issues excluded from trial because of improvements developed during preliminary proceedings, the Court notes that inmate testimony contradicts that of Hawkins on the issue of availability of cleaning supplies. Hawkins testified that the availability of supplies was a policy, but that he did not personally oversee the distribution of such supplies. Whether cleaning supplies are available or not, the photographs introduced reveal conditions so decrepit that it would be nothing short of a major project to make the jail palatable from a sanitary and cleanliness standpoint. Moreover, the crowded conditions which force overuse of the facilities must inevitably diminish the appearance, cleanliness and functionability of the entire jail.

The Court recognizes the fact that many of the prisoners themselves are responsible for creating or exacerbating the unsightly conditions, but to a certain extent, when you confine that many people into that small a space, deterioration is inevitable over a period of time whether those so confined are deputy sheriffs or convicted felons. The squalid conditions of the Sullivan County Jail are even more offensive to notions of decency when one considers the

---

**3.** The Tennessee Corrections Institute (T.C.I.) is statutorily empowered to establish minimum standards for jails, inspect same, and establish and enforce procedures to insure compliance with the standards. T.C.A. § 41–4–140.

**4.** The T.C.I. standards are to "approximate, insofar as possible, those standards established by the inspector of jails, federal bureau of prisons, and by the American Correctional Association's Manual of Correctional Standards ..." T.C.A. § 41–4–140(a)(1).

fact that some prisoners are forced to sleep on the floor, and that most of the prisoners are kept in their cells twenty-four hours a day.

The Sullivan County Grand Jury which, as part of its duties to the County Court, inspects county facilities and makes recommendations, has found the present jail facilities to be substandard and mandated that conditions be improved "before a law suit and/or a federal judge forces construction of a new facility resulting in excessive cost." (Exhibit 18, Minutes of the Sullivan County Grand Jury filed December 4, 1984). Both the Grand Jury and the Sullivan County Jail inspection committee have recommended that the workhouse be closed because of its disrepair and the fire hazard it posed.

Those in the workhouse are misdemeanants or work release inmates, and are allowed some exposure to the outside and have some chance for recreation.[5] The majority however, are never exposed to fresh air and sunlight, have no chance for exercise or recreation, (save the push-ups and sit-ups that might be done in the cell), have no television and are allowed only one non-contact visit per week for fifteen minutes. The single weekly visit is limited to blood relatives. Inmates may have radios, but only with headphones. Lighting in the cells is substandard. Inadequate lighting has long been a complaint of prisoners in Sullivan County. Since the inception of this lawsuit, additional lighting has been added, however, there is no direct in-cell lighting. Mr. Kamka testified that the bunk areas of the cells were so dark that one could not even see the toilet until one's eyes adjusted to the darkness. Mr. Jenkins testified that the jail's lighting did not meet the minimum state requirements, but that he had not checked it since the additional lighting was installed.[6]

Until recently, very little had been done to provide for the safety of the inmates in the event of fire. The Sheriff had testified at previous proceedings that communicating fire escape routes to the inmates presented too great a security risk. There is no sprinkler system. There are no smoke detectors or heat detectors in the jail. A television surveillance system in the corridors serves to alert jail personnel to the presence of smoke. A December 10, 1985 fire safety inspection by the State Division of Fire Prevention found the jail to have ten deficiencies or hazardous conditions at that time. (Exhibit No. 24).

Improvements in fire safety have been made. Jail Administrator Hawkins testified at trial that they had posted fire escape routes, (although they may not have remained posted), that the jailers wore notched keys to facilitate release from the cells in the event of fire, that the escape routes were drawn on the floor of the jail from the cells to the outside, and that the jail personnel conducted fire drills once a month. These improvements have apparently been made since Mr. Jenkins' latest inspection of the jail September 4, 1985 which cited the jail for lack of fire drills, lack of a written evacuation plan, and lack of notched keys for emergency identification. The inspection reports also reveal other offensive conditions.

Inspection reports from as far back as 1977 were admitted into evidence and they reveal that the jail has had problems for several years with inoperable sinks, toilets, and showers, ventilation, lighting, sanitation, and lack of hot water for sinks and showers. Although ten years ago these problems may not have been of Constitutional significance, their significance has increased as the number of inmates has increased over the years. In the September 4, 1985 report it was noted that insects were clearly visible; that cell areas were

---

5.  The workhouse contains only 4 square feet per inmate at a population of 30 inmates. Workhouse population often exceeds 30. Obviously, access to the outside is imperative under such circumstances.

6.  The Court understands that the defendants could do little more, if any, to correct the lighting deficiency in the present facility without complete renovation and rewiring.

not adequately cleaned, thus posing a possible health problem; that sinks and toilets were in need of cleaning and repair; that no library service was provided; and, that no record was kept of when mattresses were disinfected. The March 1, 1984 inspection found sixteen sinks, five toilets and one shower inoperable. The report cited the jail for failure to disinfect mattresses quarterly and failure to launder prisoner clothing twice a week. Of course, these reports contain many other citations, but not that relate as directly to the living conditions imposed upon those imprisoned. There is no storage available for personal belongings, which results in their being placed under the bottom bunks and/or generally strewn throughout the cells. The inmates receive two meals a day and there was some evidence that portions sometimes ran short. If they have money, they can buy vending machine items through the trusties.

The inmates are basically idle and crowded together in their cells day and night. This inevitably escalates the normal problem of inmate assaults upon one another as well as upon jail personnel. Of course, greater security problems, which arise with increased numbers of inmates, necessitate the imposition of more restrictive conditions. James Cody, who spent over 300 days in the jail, testified that being exposed to the overcrowded, unsanitary, unsafe, conditions 24 hours a day, day after day, presented a "strain on your brain," and engendered hostility and despair. Mr. Kamka, whose experience in corrections is complemented by a masters degree in psychology, testified that the conditions he observed at the jail would be stressful,

unsafe, hazardous, and debilitating on an individual depending upon the length of confinement.[7]

County jails are generally thought of as short-term facilities with a population constantly under transition, but in Tennessee, some convicted felons can be sentenced to terms of up to six years in the county jail. The representative plaintiffs in this action spent anywhere from a few days to over a year in the Sullivan County Jail. Thus, exposure to the offensive conditions cannot be considered minimal. The greater the length of confinement, the more debilitating such conditions would be. Although the jail population will constantly be in transition, many of those incarcerated in Sullivan County remain for several months.

The Court finds, from the facts outlined above that the conditions of confinement at the Sullivan County Jail violate the rights of those confined to be free from cruel and unusual punishment under the Eighth Amendment.[8]

The primary cause of Sullivan County's Constitutional violation is the overcrowding. However, it is not simply the number of square feet per inmate which is determinative,[9] the Court must look to the totality of the circumstances in determining whether a particular confinement violates the Constitutional rights of an inmate. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Jones v. Diamond*, 636 F.2d 1364 (5th Cir.1981); *Bradford v. Gardner*, 578 F.Supp. 382 (E.D.Tenn.1984). This Court previously considered the constitutionality of the living conditions of the Sullivan County Jail in the *Bradford* case. *Id.* However, in that case, the decision was limited to the condi-

---

**7.** *See, Campbell v. Cauthron,* 623 F.2d 503, 506 (8th Cir.1980) ("detrimental physical consequences of enforced idleness in a small living space, and the negative effect of overcrowding on prisoner's mental states is well documented....").

**8.** The Court's finding that the conditions of confinement amount to cruel and unusual punishment presupposes that those same conditions of confinement violate the rights of pretrial detainees to be free from punishment without due

process of law. *See, Campbell v. Cauthron,* 623 F.2d 503 (8th Cir.1980).

**9.** "No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual...." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), *but see, Gates v. Collier,* 423 F.Supp. 732 (N.D.Miss.1976), *aff'd,* 578 F.2d 1241 (5th Cir.1977) ("50 sq. ft. of living space per inmate is the minimal acceptable requirement to comport with the Constitution.")

tions of a single inmate and "the only serious constitutional question ... [was] whether the crowded sleeping quarters were *per se* unconstitutional." *Id.* at 383–384. In *Bradford,* this Court refused to impose a minimal square foot requirement in light of the Supreme Court's decision in *Rhodes v. Chapman.*

In the present case, the inquiry is into the totality of circumstances surrounding an inmate's confinement in the Sullivan County Jail, and involves not a single individual, but an entire class. Thus, the *Bradford* decision is of no precedential value in this case in regard to the determination of whether the conditions of confinement at the Sullivan County Jail are constitutional. Moreover, since conditions change over time, "the use of precedents as to prison conditions is suspect." *Kirby v. Blackledge,* 530 F.2d 583 (4th Cir.1976).

Whether prison conditions amount to cruel and unusual punishment must be determined " 'from the evolving standards of decency that mark the progress of a maturing society.' " *Rhodes v. Chapman, supra,* 452 U.S. at 346, 101 S.Ct. at 2399, *quoting, Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). It is by applying these "standards of decency" that the Court reached its opinion that the prison conditions at issue do violate the Eighth Amendment. In making this determination the Court relies upon the reports and suggestions of the Sullivan County Grand Jury, the reports and suggestions of the Sullivan County Grand Jury, the reports and suggestions of the Sullivan County Jail Com-

mittee, the reports and suggestions of Jail Inspector Jenkins, the expert testimony of Gordon Kamka, who characterized the jail as one of the three worst he has ever seen in his over twenty years in the field, the testimony of the representative plaintiffs, the T.C.I. and A.C.A. recommended standards, other exhibits admitted into evidence, the Court's own perception of decency and humane treatment, and similar decisions from other jurisdictions.[10]

It is neither the province, nor the desire of this Court to impose its views of how best to run a jail upon the officials of Sullivan County.[11] Such considerations are the responsibility of the legislative and executive branches of state and county governments, and must be accorded deference so long as they comport with constitutional requirements. However, when jail conditions run afoul of the Constitution, it is not only the province, but the duty of this Court to intervene.

In the present case, we are not dealing with policies and considerations which are properly left to the wisdom and discretion of jail administrators. We are not talking about peripheral issues such as whether inmates can receive the book-of-the-month in hardback, or must wait until it comes in paperback. We are dealing here with the bottom-line conditions of basic human existence. "Nothing less than the dignity of man" has been implicated by the offensive conditions of the Sullivan County Jail. *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958).

10. *E.g., Campbell v. Cauthron,* 623 F.2d 503 (8th Cir.1980) (17–26 square feet per inmate found unconstitutional); *Jordan v. Wolke,* 460 F.Supp. 1080 (E.D.Wisc.1978) (22½ square feet per inmate of cell space, plus 17 square feet per inmate of day room space found unconstitutional); *Rutherford v. Pitchess,* 457 F.Supp. 104 (C.D.CA 1978) (approximately 25 square feet per inmate approved given the frequent and substantial periods of time out of the cell); *Ahrens v. Thomas,* 434 F.Supp. 873 (W.D.Mo.1977) (10–12 square feet per inmate found unconstitutional, ordered new jail to provide 70 square feet per inmate); *Anderson v. Redman,* 429 F.Supp. 1105 (D.Del.1977) (Constitutional compliance re-

quired provision of 75 square feet per inmate); *Ambrose v. Malcolm,* 414 F.Supp. 485 (Constitutional compliance required provision of 75 square feet per inmate). *Compare, Delgado v. Cady,* 576 F.Supp. 1446 (E.D.Wisc.1983) (10–17 square feet not constitutionally inadequate where inmates allowed daily outdoor exercise, daily visitation and were out of cell anywhere from 2–12 hours per day).

11. *See, Bell v. Wolfish,* 441 U.S. 520 (1979) at 539, 540, 547, 548, 562, fn. 23, 29, 99 S.Ct. 1861, 1874, 1875, 1878, 1879, 1886, fn. 23, 29, 60 L.Ed.2d 447.

Simply crowding more than one inmate in a limited living area has been described as "among the most debasing and most dehumanizing aspects of present prison life. It rips away the sense of privacy—of dignity—which can make bearable many things which otherwise could not be endured." *Delgado v. Cady*, 576 F.Supp. 1446, 1448 (E.D.Wis.1983). The court in *Rutherford v. Pitchess*, 457 F.Supp. 104 (C.D.Cal.1978) found the practice of requiring some inmates to sleep on mattresses on the floor because of a shortage of beds to be "intolerable" and unconstitutional. *Id* at 109.

■ Lack of opportunity for regular outdoor recreation alone has been held to violate the Eighth Amendment. *Ahrens v. Thomas*, 434 F.Supp. 873 (W.D.Mo.1977); *Sinclair v. Henderson*, 331 F.Supp. 1123 (E.D.La.1971). In the case at bar, the offensiveness of this restriction is exacerbated, as are most other debilitating conditions, by the overcrowding and constant confinement to the cell areas. The result is that the average inmate is confined 24 hours a day in a physically delapidated, insect infested, dimly lit, poorly ventilated area averaging under 20 square feet per inmate, without any available recreation or diversion other than some reading or letter writing, sharing a shower, which may or may not have hot water, with twelve to fourteen others, sharing a sink and toilet, which may or may not be operable, with three or four others, possibly sleeping on the unsanitary floor, or within inches of the toilet, in clothing that may not have been recently washed. The totality of these conditions offend notions of decency and are offensive to the Eighth Amendment prohibition against cruel and unusual punishment.

Much has been made by the defendants of constraints placed upon them which are beyond their control—most notably, the refusal of the state corrections system to accept sentenced inmates from the jail at times because of the state's own problems with overcrowding. However, as the proof revealed, the Sullivan County Jail has been overcrowded since before the state began refusing newly sentenced inmates. Moreover, the various causes of the jail's present situation are of little consequence to this inquiry. The defendants have not acted in bad faith. They have simply been faced with the ever-increasing challenge of fiscal management, recent passage of more severe criminal laws and society's demand for the imposition of punishment upon those convicted. The result has been further deterioration of the conditions in an already marginal facility. That there may be some justifications for these conditions is irrelevant. The Constitution mandates that those incarcerated not be subjected to cruel and unusual punishment. Upon a finding of such a violation it is the duty of this Court to intervene and order it corrected, regardless of the fact that it may result in additional expenditures.

Sullivan County has broken ground in the last month or so for the construction of a new jail facility, a project originally initiated several years ago. Completion of the new facility is projected to be fifteen months away. Thus, this Court is faced with the issue of what must be done in the interim at the present facility to assure the constitutional rights of those incarcerated therein.

Jail Inspector Jenkins' recommendations at trial included reducing the population in the main facility to 69, allowing at least one hour of visitation per week per inmate and the initiation of a program of exercise or recreation. These recommendations are based upon the minimum state requirements.

Mr. Kamka had several recommendations including reducing the population in the main facility to 64 assuming visitation will be increased and regular out of cell recreation opportunities will be provided.[12]

---

12. Kamka actually recommended reduction of population to 32, but stated that during the pendency of the new construction, housing 64 inmates in the main facility would be acceptable given the assumptions mentioned.

Defendants themselves offered, prior to trial, to reduce the population in the main facility to 100 within 90 days, close the workhouse, and construct a prefabricated 3500 square foot metal building on the grounds of the new jail site for the housing of misdemeanants and work-release inmates.

■ After evaluation of the circumstances and careful consideration of the evidence and recommendations set forth above, the Court holds, that to provide constitutionally acceptable confinement, the population at the main facility must be reduced to 70, regular out-of-cell recreation must be provided, visitation must be increased, and fire escape plans must be communicated to the inmates and prominently displayed in the corridors at all times.[13] Obviously, compliance with Constitutional requirements, as set forth more specifically in the Orders that follow will take the cooperation and creativity of both state and county officials working in conjunction with the Sheriff, and the Court would expect nothing less.

Accordingly, it is hereby ORDERED that the population of the main facility at the Sullivan County Jail be reduced to one hundred (100) inmates within ninety (90) days, and seventy (70) inmates within one hundred eighty (180) days. The maximum number of inmates so confined thereafter may fluctuate between 65 and 75, but shall not exceed 75. It is further ORDERED that within ninety (90) days total visitation for the entire population in the main facility be increased from four (4) hours per week to eight (8) hours per week, one (1) hour of out-of-cell exercise/recreation be provided for every inmate at least five (5) time per week, blown-up fire escape plans be conspicuously placed on the walls of the jail under sheets of plexiglass as described by Captain Hawkins at trial; that the workhouse, as it is presently constituted, be closed within ninety (90) days; and that the county proceed with the construction of a prefabricated metal building which will

comply with State T.C.I. requirements, as a replacement for the workhouse.

and no longer used to house inmates.

13. Defendants have assured the Court that the workhouse will be closed as a part of the jail,