**Michael D. REECE, et al., Plaintiffs,**

v.

**Don GRAGG, Tom Scott, Bernard Hentzen, Sedgwick County Commissioners, and Michael Hill, Sheriff of Sedgwick County, Kansas, Defendants.**

Civ. A. No. 82–1970.

United States District Court, D. Kansas.

Dec. 17, 1986.

and responsibilities between an employee and his employer.

Jim Lawing, Wichita, Kan., for plaintiffs.

Royce E. Wallace, Wichita, Kan., for defendants.

## OPINION AND ORDER

THEIS, District Judge.

On October 14, 1982, Michael Reece was arrested and charged with a traffic offense. Pursuant to his arrest, he was incarcerated in the Sedgwick County jail briefly, and was later released on bond. While in the jail, he was given a mattress and told he would have to sleep on the floor because there were no available bunks. On November 16, 1982, he brought this action pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983, contending that the conditions of the jail violated the constitutional prohibition against cruel and unusual punishment. He sought injunctive relief against defendants to require them to cease and desist operation of the Sedgwick County Jail under the present conditions, and for damages in excess of $10,000.00. Plaintiff later waived his request for monetary damages in open court, so this action now seeks only injunctive relief.

This matter was certified as a class action on February 13, 1984, with plaintiff representing the class of all present and future sentenced inmates of the Sedgwick County Jail. Subsequently, the Court granted the motions of Ronald Cross and Robert Engle for intervention. Engle has replaced Reece as the representative of the class of sentenced inmates. The Court also granted Cross' motion for certification of a class of all present and future pretrial detainees held in the Sedgwick County Jail, formalizing the way both parties and the Court had viewed the case from the outset.

On January 24, 1985, the Court conducted an unannounced tour of the jail facilities. Based on the Court's observations and conversations with prisoners during that tour, the Court issued a report listing problems it discerned with the jail. Among other things, the problems then involved excessive overcrowding of bunks into small cells; lack of day rooms or exercise rooms for daytime activities for the prisoners; toilet facilities that were dirty, stained, and had no seat or lid; walls, floors and bars which were dirty and in need of repainting; massive insect infestation; a lack of adequate personal hygiene products such as soap and razors; a small number of showers available to service all the prisoners; restrictive telephone policies; complaints of inadequate medical attention; complaints involving food quality and lack of hygienic standards in serving the food; a hot and fetid climate; and numerous appliances such as heaters and fans in need of repair. During 1985 and 1986, the Court conducted a number of hearings at which various assertions were made by plaintiffs' counsel, some admissions were made by defendants' counsel, and evidence was presented on jail conditions.

On January 29, 1986, the Sedgwick County Commission enacted a resolution to authorize a mail ballot election to obtain voter approval for the issuance of bonds to construct a new jail. The amount of the bonds was for approximately twenty-three million dollars. This mail ballot election was to be completed by April 10, 1986. The election was held amidst much publicity, and the bond issue was defeated.

On September 24, 1986, plaintiff filed a new motion for summary judgment, wherein he urged the Court to set a population ceiling of 81 (Kansas Department of Correction's standards) or at least of 135 (maximum number the facility was intended to house when it was built in the 1950s). Additionally, the motion seeks the establishment of a date no more than two years hence by when the constitutional problems of the facility must all be resolved, or the facility ordered closed. This motion has been fully briefed. On November 12, 1986, the Court conducted another visit of the jail premises. Although unannounced, the visit could not exactly be characterized as a "surprise" visit, because the county had been inviting the Court to visit for some time.

Since the Court's last visit, the Sheriff has made significant improvements in the facility. Most notably, the Court was impressed with the dramatic improvements made in cleanliness. The facility was freshly painted in a bright color which, along with the improved lighting in the jail, substantially reduced the drab nature of the facility evident on the last visit. Visitation and telephone policies were also improved. However, the Court noted several continuing problems. Chief among these was the tremendous overcrowding that continues unabated from the last visit. The plumbing facilities are still antiquated, unsightly and apparently unsanitary. The Court's impressions and findings of the current status of the jail will be set out in more detail below. Briefly, the Court finds that substantial improvements have been made, but that severe problems still exist.

Plaintiff's motion for summary judgment is currently pending before the Court. Also pending before the Court is plaintiff's earlier motion for partial summary judgment, seeking an order from this Court prohibiting the defendants from placing juveniles in the jail. The Court has delayed resolution of these motions for a reason. This Court is not amenable to partisan po-

litical pressures or exigencies. Our democratic government has been tolerant of the political principle that citizens choose their representatives and should not have decisions on individual candidates influenced by judicial decision, especially at an election time. Further, although the jail issue is one of constitutional magnitude, it is not going to be solved by any instantaneous political action. Hence, the Court postponed until after the election its decision on what must be done to alleviate the present abhorrent conditions at the jail.

## I. SUMMARY JUDGMENT STANDARDS

The Court is familiar with the standards governing the consideration of a motion for summary judgment. Summary judgment is a drastic remedy to be applied with caution in order to preserve a litigant's right to trial. *Machinery Center, Inc. v. Anchor National Life Insurance. Co.*, 434 F.2d 1, 6 (10th Cir.1970). To rule favorably on a motion for summary judgment, the Court must first determine that the matters on file regarding the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). By its very terms, Rule 56(c) "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, ——, 106 S.Ct. 2505, 2510 (1986) (emphasis in original). Instead, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at ——, 106 S.Ct. at 2512. However, the Court must look at the record in the light most favorable to the non-moving party. *Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981). Pleadings and documentary evidence must be liberally construed in favor of the party opposing the motion. *Harman v. Diversified Medi-*

*cal Investments Corp.*, 488 F.2d 111, 113 (10th Cir.1973), *cert. denied* 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). If the facts support an inference which would permit the non-movant to prevail, summary judgment is inappropriate. *Thomas v. United States Department of Energy*, 719 F.2d 342, 344 (10th Cir.1983).

## II. CONSTITUTIONAL VIOLATIONS

■ Conditions of confinement in jails are subject to constitutional scrutiny when pretrial detainees claim the protections of the due process clauses of the Fifth and Fourteenth Amendments, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), or when convicted inmates contend that they suffer cruel and unusual punishment in violation of the Eighth Amendment, *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Sentenced inmates may be held under conditions that are punitive, while pretrial detainees may not be because they are still cloaked with the presumption of innocence. Therefore, as to pretrial detainees, "the proper inquiry is whether [the] conditions [of confinement] amount to punishment of the detainee." *Bell*, 441 U.S. at 535, 99 S.Ct. at 1871. Sentenced inmates may be punished, but the Eighth Amendment prohibits any punishment that involves the unnecessary infliction of pain, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1979), or that is incompatible with societal standards of decency, *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Since the Sedgwick County Jail houses both pretrial detainees and convicted inmates, both standards are relevant to determining the propriety of relief, although, to the extent that the jail is unable to segregate pretrial and sentenced inmates, the higher standard applicable under the due process clause must be met for the entire facility. *Fischer v. Winter*, 564 F.Supp. 281 (N.D.Cal.1983). However, the distinction is immaterial, since the Court finds that even the Eighth Amendment standard is not satisfied.

## A. Overcrowding

Overcrowding amounts to punishment when it "subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson*, 651 F.2d 96, 103 (2nd Cir.1981). In deciding whether overcrowding is unconstitutional for convicted inmates, the inquiry is whether the totality of conditions "deprive[s] inmates of the minimal civilized measures of life's necessities." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2398. The many federal cases concerning jail overcrowding establish no clear standards for ascertaining at what point overcrowding violates the Eighth Amendment, although the conditions in other cases and the analysis employed by other courts affords this Court some guidance in its determination. In *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), the Supreme Court held that allegations of overcrowding must be tested by an examination of the effects of overcrowding on the totality of prison conditions, including among other factors the adequacy of food, sanitation, medical care, and the quality of the physical facility. Yet, overcrowding may be the root cause of deficiencies in other areas of prison life. *Fischer v. Winter*, 564 F.Supp. 281, 298 (N.D.Cal.1983). Indeed, a number of recent cases have found constitutional violations which in large part were the product of overcrowding. *See, e.g., Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir.1984); *Wellman v. Faulkner*, 715 F.2d 269 (7th Cir.1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984); *Monmouth County Correctional Institution Inmates v. Lanzaro*, 595 F.Supp. 1417 (D.N.J.1984); *Benjamin v. Malcolm*, 564 F.Supp. 668 (S.D.N.Y.1983). The decision in the instant case is not based solely on the overcrowding. The Court has considered the crowding as it affects the factors listed in *Rhodes*.

The Sedgwick County Jail was designed to house 135 inmates when it was built in the 1950s. Under today's standards, the Kansas Department of Corrections would recommend that this facility house no more than 90 inmates. Yet, in 1986, an average of 239 prisoners were confined in the jail on any given day. In 1985, an average of 225 inmates were in the jail each day. On one dark day in that year, a total of 298 inmates were housed there. Even worse, the county has rated the population capacity of the facility at 327; that is, the county has placed on a permanent basis 327 bunks in the jail facility (13 of which are located in isolation cells) and apparently would have no compunctions about filling every one of them.

In *Battle v. Anderson*, 564 F.2d 388 (10th Cir.1977), the Tenth Circuit Court of Appeals affirmed the district court's finding of a constitutional violation where the institution was 91% over capacity. The United States District Court for the Northern District of New York issued injunctive relief where a jail population fluctuated between 2.4% and 31.1% over capacity. *Albro v. County of Onondaga*, 627 F.Supp. 1280 (N.D.N.Y.1986). *See also Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex.1980) (constitutional violation where the prisons were 100% over design capacity); *Ambrose v. Malcolm*, 414 F.Supp. 485 (S.D.N.Y.1976) (injunctive relief granted when institution was operated at 66⅔% over rated capacity). During the past year, the Sedgwick County Jail has operated on the average at 266% over recommended capacity. Indeed, the Sedgwick County Jail's overpopulation in relation to its design capacity was far more egregious than any other example of overcrowding seen by the Court in its review of reported cases.

An additional way of evaluating the extent of overcrowding at the Sedgwick County Jail is to examine the amount of space provided per inmate. By adding the individual cells' measurements, not including holding and isolation cells, the Court has determined that there is a total of 9263 square feet of space available in the jail. In that area, the County has placed 314 bunks. If all bunks were filled, each inmate would be afforded an average of only 29.5 square feet of space (before deductions for space occupied by bunks, stools

and showers). Of course, the jail has never housed 314 inmates. But based on the last four years' average daily population of 239, each inmate still had only an average of 38.76 square feet of space available (again before deductions for stools, showers, and for all 314 bunks, which are there whether filled or not). Even this average does not give a completely accurate picture, however, since some cells are far more cramped than others. For instance, the city tank cell on the fifth floor has ten bunks in a room of only 166 square feet. If all of these bunks were filled, the inmates would each have only 16.6 square feet of space available. Not counting this tank, the cell space averages in the jail range from a high of 68 square feet to a low of 18 square feet per inmate.

Numerous courts have determined that overcrowding in cell areas constitutes cruel and unusual punishment even when the inmates had considerably more cell space than the inmates in the Sedgwick County Jail. *French v. Owens*, 777 F.2d 1250 (7th Cir.1985) (double-celling in 48 square feet of space unconstitutional); *Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir.1984) (prisoners were unconstitutionally confined when each had 54 square feet of cell space); *Campbell v. Cauthon*, 623 F.2d 503 (8th Cir.1980) (17–26 square feet per inmate found unconstitutional); *Burks v. Teasdale*, 603 F.2d 59 (8th Cir.1979) (unconstitutional to hold two inmates in 47 square foot cells and three inmates in 65 square foot cells); *Johnson v. Levine*, 588 F.2d 1378 (4th Cir.1978) (unconstitutional to hold two inmates in 44 square foot and 50.7 square foot cells for ten to fifteen hours per day); *Battle v. Anderson*, 564 F.2d 388 (10th Cir.1977) (adopting as a constitutional minimum the standards of the American Public Health Association: 60 square feet per inmate in a cell; 75 square feet per inmate in a dormitory); *Jackson v. Gardner*, 639 F.Supp. 1005 (E.D.Tenn.1986) (housing prisoners in cells of 20 square feet unconstitutional); *Hendrix v. Faulkner*, 525 F.Supp. 435 (N.D.Ind.1981), *aff'd sub nom. Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983) (cell size ranging between 37.3 and 38.3 square feet amounts to unconstitutional overcrowding); *Ramos v. Lamm*, 485 F.Supp. 122, 170 (N.D.Col.1979), *aff'd*, 639 F.2d 559 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (district court ordered that "no prisoner ... may be housed in less than 80 square feet for 20 or more hours a day. If the confining space decreased from 80 square feet, the hours of confinement therein must be reduced proportionately."); *Ahrens v. Thomas*, 434 F.Supp. 873 (W.D. Mo.1977) (court ordered new jail to provide 70 square feet per inmate); *Anderson v. Redman*, 429 F.Supp. 1105 (D.Del.1977) (constitutional compliance required the provision of 75 square feet per inmate); *Ambrose v. Malcolm*, 414 F.Supp. 485 (S.D.N.Y. 1976) (75 square feet per inmate required).

Distinguishable from the present case are two recent Supreme Court decisions. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court held that double-celling of pretrial detainees in a seventy-five square foot room was not violative of due process. Unlike the situation in the instant case, in *Bell* the cells in question were used only for sleeping, and the detainees had substantial room to move about in common areas during the day. Furthermore, the common areas contained a variety of exercise and recreational equipment. The Supreme Court observed that the facility in *Bell* "differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates." *Id.* at 525, 99 S.Ct. at 1866. In contrast, the Sedgwick County Jail has barred cells and steel gates, and, as this Opinion later explains, no opportunities for inmate exercise.

In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Court determined that double-celling of convicted inmates in cells averaging sixty-three square feet was not unconstitutional. The institution involved in *Rhodes* was described as a "top-flight, first-class facility," which was essentially state of the art in prison construction. *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977). Each

cell had shelf space, a cabinet, a built-in radio, and a heating and air circulation vent. Many of the cells had windows that the inmates could open and close. About 75% of the inmates were in their cells only at night and had dayrooms, schools, workshops and gymnasiums available to them during the day. None of these factors are present in this case.

While the amount of space per inmate in the Sedgwick County Jail, standing alone, is deplorable, the Court cannot assess these figures in isolation. In *Lareau v. Manson,* 651 F.2d 96 (2nd Cir.1981), the court emphasized the importance of the duration of confinement as a factor in the constitutional balance. For example, the court in *Lareau* permitted double-celling for a period of up to fifteen days. The County has submitted an estimate of the average length of stay for 1984 as 31 days and an average length of stay for 1986 as 20 days. However, the Court notes that these figures are only estimates and that they do not afford an accurate picture of the duration of confinement, since the release of a substantial percentage of inmates within just a few days skews the statistics. Between October of 1979 and September of 1983 (the most recent figures available to the Court), a study of the Sedgwick County jail population revealed that almost two-thirds of inmates incarcerated in the jail resided there for two days or less. K. Arnold, *The Sedgwick County Jail: An Inmate Population Study* 8 (1984). Since the two day residents are figured into the county's 31 day average, it is apparent that the balance of the inmates reside in the jail substantially longer than 31 days.

Perhaps a more relevant consideration at the Sedgwick County facility is that many inmates are confined in their own cells twenty-four hours a day. While some inmates are in cells which, during the day, may be open to interconnected cells, this does not increase the available space per inmate. It merely allows inmates to move from their crowded cells into other inmates' crowded cells. Furthermore, none of the inmates has access at any time to exercise or activity rooms or equipment.

The sheer physical limitations have detrimental consequences on the mental well-being of the inmates. The negative effect of overcrowding on prisoners' mental health is well-documented. *Campbell v. McGruder,* 580 F.2d 521, 536 (D.C.Cir.1978) (overcrowding impairs mental health, causes tension, and permits sexual assaults); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2nd Cir.1972) (coerced stagnation seriously threatens the mental soundness of the inmates); *Inmates of Allegheny County Jail v. Wecht,* 565 F.Supp. 1278, 1295 (W.D.Pa. 1983) (overcrowding causes idleness and increased noise levels); *Ruiz v. Estelle,* 503 F.Supp. 1265, 1391 (S.D.Tex.1980) (". . . it is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer within [unconstitutionally operated prisons] . . .; the sheer misery, the discomfort, the wholesale loss of privacy for prisoners housed one, two, or three in a forty-five foot cell. . . ."). Simply crowding too many people into too small a space has been described as "among the most debasing and dehumanizing aspects of present prison life. It rips away the sense of privacy—of dignity—which can make bearable many things which otherwise could not be endured." *Delgado v. Cady,* 576 F.Supp. 1446, 1448 (E.D.Wis.1983).

█ The only conceivable purpose of overcrowding at the Sedgwick County Jail is to allow the county to house more inmates without creating more jail space. This economic motive is an impermissible justification for the resulting constitutional violations. *Lareau v. Manson,* 651 F.2d 96, 104 (2nd Cir.1981). *See also Ahrens v. Thomas,* 434 F.Supp. 873, 898 (W.D.Mo. 1977) ("Inadequate resources can never be an adequate justification for the State's depriving any person of his constitutional rights.").

**B. Other Unconstitutional Conditions**

█ The offensiveness of the physical space limitations is exacerbated by other undesirable conditions that exist at the jail.

These conditions, while perhaps not unconstitutional in and of themselves, combine with each other and with the overcrowding to convince this Court that, considering the totality of the circumstances, the Sedgwick County Jail is unconstitutional.

Two significant problems with the current facility are closely related to the overcrowding in that they also involve lack of space. The first is critical: inmates have no area available for exercise. In fact, no space outside of the inmates' cells exists for activity of any type at all. Coupled with the crowded conditions inside the cells, this means that inmates can do little all day except sit or lie on their bunks. A review of the reported cases on the unconstitutionality of jails has convinced the Court that this is considered to be as significant a problem as overcrowding in the cells. The "[l]ack of opportunity for regular outdoor recreation alone has been held to violate the Eighth Amendment." *Jackson v. Gardner*, 639 F.Supp. 1005, 1011 (E.D.Tenn.1986). *See also Laaman v. Helgemoe*, 437 F.Supp. 269, 309 (D.N.H.1977) ("The Constitution does not demand sophisticated athletic equipment or an Olympic style gym; it does require that sufficient opportunities be offered all inmates so that they can keep physically fit.").

The second problem, also related to lack of space, is that no separate dining area exists for any inmates. The lack of dining space is especially critical in light of the preceding demonstration of lack of activity space. This leaves an inmate only his cell in which to receive and consume his meals. Coupled with the demonstrated fact that the inmates' cells are already horribly overcrowded, the inmates have no room in their cells for tables from which to consume their meals. They are therefore forced to eat from their bunks, a situation that is not only unpleasant but unsanitary and likely to add to pest control problems.

Like the problems concerning the lack of space in the jail, the remaining deficiencies are almost exclusively related to the inadequacies of the physical structure as opposed to problems with the Sheriff's staff or operational procedures. Among these are basic creature comfort considerations. Adequate ventilation to provide sufficient fresh air is lacking. Inadequate temperature control exists. The Court's most recent tour was conducted on a bitterly cold day. The jail was discovered to be warm on that day; in fact, it was almost hot. Indications are that, due probably to the building's heating system, it is usually hot and fetid there in the winter. The Court has received numerous complaints about the oppressive heat problems during the summer as well: the jail is not air conditioned and the limited number of fans available simply blow the hot air around.

Especially critical is the antiquated and unsanitary plumbing system that exists at the jail. The stools and sinks available to the inmates in their cells are ancient, stained, unsanitary and repulsive. Incident report logs show that a disproportionate number of facility problems are related to the worn out plumbing system. The electrical wiring system in the jail also is inadequate for the population and for modern electrical requirements. The Court suspects that it certainly would not meet with standard electrical codes. Unconfirmed reports of dangerous outlets have been received by the Court. The Court has personally observed an excessive, and probably unsafe, use of extension cords in places where appropriate wiring should exist.

The defendants have made significant progress in cleanliness and pest control. However, complaints about cleanliness continue to be received, perhaps inevitably. Complaints about excessive noise levels also are registered, and those are primarily a product of the large number of people housed in a structure that is basically only an open floor divided only by cell bars. Yet despite this open floor arrangement the floors are not designed so that guards can see into cell areas from their stations. Only one elevator exists for the entire eight floor jail. There is no appropriate segregation system for mentally or chemically impaired inmates, violence prone inmates, juveniles, inmates with emotional or

medical problems, suicidal inmates, or escape artists. In short, the building is antiquated, outmoded, seriously crowded, and not adequate for the use required of it today.

Plaintiff submitted to this Court at an earlier hearing the daily incident report log which began at the first of this year. That log showed almost daily problems with the facility requiring constant attention from the jail administrators. Substantial improvements have been made by the Sheriff's department in the overall physical condition of the jail; improvements that the Court would not belittle, and which in fact it applauds. Even the plaintiff in his brief supporting his motion for summary judgment admits of numerous improvements. Dk. 97, p. 5. But serious physical problems remain which are mostly of a structural nature. The Sheriff can not be blamed for these problems, but neither can the deficiencies be tolerated.

While facility problems predominate, and are the principal basis for this Court's finding that the Sedgwick County Jail is unconstitutional, there are some operational practices or policies that also concern the Court. The *Sedgwick County Detention Facility Policy and Procedure Manual* has been made available to the Court. The Court finds it largely commendable and enlightened. But some policies bear investigation. Currently, when they check in, inmates are provided with a clean towel, mattress, pillow, pillowcase, *one* sheet, and one blanket, in addition to his or her standard issue orange jumpsuits or coveralls. They are given only one jumpsuit to wear, and it *is* laundered only once a week. Although they are not given a top sheet for their bunks—just a blanket—the blanket is scheduled to be laundered only after the inmate has used it for three months. The Court believes that hygienic concerns would dictate a more frequent schedule of laundering both items. It may be that the jail's laundry facilities will not accommodate a more frequent schedule, but if so, the facilities should be improved or laundry sent out.

Significant improvements have been made in the visitation policy. Visitation has been moved from the individual cell floors, where it was noisy and awkward, to a second floor visitation room equipped with individual stalls which provide a large viewing glass and audio assistance. Additionally, visitation time has been expanded from a Sunday afternoon melee to a six day a week procedure. But it should be noted that this jail, like most jails, has no provision for contact visitation. The Court also notes that while it was informed that the *practice* is to generally let visits continue until a natural termination, the *written policy* limits each prisoner's visitation time to thirty minutes regardless of how many visitors he or she is receiving. While the Court believes that prison officials should have significant discretion in shaping their visitation policies, any isolation caused by strictures on visitation must be viewed as an additional factor in the Eighth Amendment calculus.

The policy manual is silent as to the practices concerning providing inmates shampoo and razors. If shampoo is not provided, it should be. The Court, during its last tour of the facility, received conflicting reports from officers of the Sheriff's department concerning the availability of safety razors to inmates. Naturally, this is a security concern, and one in which the Court is hesitant to interfere. Yet it appears that when razors are distributed to the men in the mornings, a razor may be expected to be shared by several men. While the Court is not certain how many men share a razor, it was reported to the Court that as many as twenty men may share a single razor. This unwritten policy of "community razors" also bears examination.

Upon consideration of the totality of the conditions at the Sedgwick County Jail, the Court finds that the human warehousing that is occurring at the jail violates the due process clauses of the Fifth and Fourteenth Amendments and runs afoul of the Eighth Amendment's proscription against cruel and unusual punishment. By this Opinion

and Order, the Court does not intend to impose its views of how best to run a jail on the officials of Sedgwick County; nor is the purpose of the Court's order to intercede in the internal administration of the jail. However, in this case the Court is not dealing with mere administrative matters or policies which should be left to the wisdom of jail administrators. This lawsuit involves nothing less than the most basic conditions of human existence. When the overcrowding of prisoners in antiquated facilities becomes incompatible with contemporary standards of decency, it is not only the province, but the duty, of this Court to intervene.

As stated previously, the jail officials made some significant improvements in the cleanliness and provisions available for inmates at the Sedgwick County jail in the interim between the Court's first visit and the Court's most recent tour of inspection. Yet, administrators have been stymied by the lack of financial means to alleviate many of the adverse effects of the living conditions.

> Though the county defendants are subject to order of this court to take affirmative steps to eliminate the unconstitutional conditions, the court would be remiss if it laid blame on the county officials responsible for running the [jail]. Rather, the blame must fall squarely on the shoulders of the public which pressures legislators to increase criminal penalties yet simultaneously denies the authority for public expenditure for programs directed toward persons against whom these laws are enforced—whether these be alternative programs for pretrial release or alternate sentences or for construction of additional prisons.

*Albro v. County of Onondaga*, 627 F.Supp. 1280, 1286 (N.D.N.Y.1986).

▬ The Court does not have the power to order legislative appropriations for jail construction. However, unconstitutional conditions will not be tolerated merely because constitutional requirements are expensive to satisfy. The Court possesses the power to order prison officials to fulfill certain constitutional minima. *Jackson v. Gardner*, 639 F.Supp. 1005, 1011 (E.D.

Tenn.1986). The Court specifically wants to put to rest any speculation that its order will result in coddled felons or a country club jail; the Court is ordering only the removal of the current dilapidated, debilitating and intolerable conditions, and the provision of constitutionally acceptable conditions of confinement.

## III. REMEDY

This Court has no reservoir of funds nor any suggested method of raising funds for the construction of a minimally sufficient jail. The Court has no architects, engineers or general contractors standing by. Even if this Court could order a new jail built, it would not do so. A decision such as that is a decision to be made by the political process, not by judicial fiat. But the courts do have a duty to enforce constitutional standards, and the continued operation of the Sedgwick County Jail in its current position is clearly unconstitutional and cannot be allowed to continue indefinitely. The Court has waited on the political process as long as it can, and has now reached the point where it can no longer continue to ignore the egregious constitutional violations in the present facility. The Court therefore finds the present operation of the Sedgwick County Jail unconstitutional.

▬ The Supreme Court has stated that "once a constitutional violation is demonstrated, the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth is inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). A district court's equitable powers are certainly no less broad in the instance of unconstitutional conditions at a jail as here than were the court's powers to remedy the school desegregation crisis in *Swann*. The federal courts are equally obligated in both cases to correct the wrongs and to enjoin them from continuing. "When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional

rights.'" *Rhodes v. Chapman*, 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981) (citations omitted). Having found the Sedgwick County Jail in violation of the Eighth Amendment's proscription against cruel and unusual punishment, and in violation of the Fifth and Fourteenth Amendment's due process provisions, this Court now enjoins the defendants from continuing to operate the Sedgwick County Jail in its present condition. It is well within the Court's power to issue such an injunction. Courts have not hesitated to shape various forms of injunctive relief in prison and jail cases when constitutional violations have been established. *See, e.g., Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir.1977); *Johnson v. Levine*, 450 F.Supp. 648, 661 (D.Md.1978).

The Court is cognizant of the fact that the jail currently houses nearly 250 inmates whom the courts have decided should not be at liberty in society for one reason or another. Without minimizing the egregious nature of the constitutional deficiencies in the jail, the Court recognizes that the wholesale release of these inmates upon society would create even greater problems. Therefore, the Court stays enforcement of its injunction upon continued operation of the jail on the following conditions:

## A. Remedial Action Proposal

The County through its proper officials is to present to this Court a plan for bringing the Sedgwick County Jail facilities into compliance with *all* constitutional standards. Whether the County chooses to do so by renovation of the existing facility, renewed use of other facilities in the county, construction of new facilities, or some combination of these or other factors is not material to the Court. All that is required is that the County's proposal meet constitutional guidelines not only concerning square feet per inmate, but also regarding operational and physical plant standards. Minimum constitutional standards for jail facilities are too detailed and too well known to bear repeating in full here. The Court will inform the defendants that it has relied on the Kansas Department of Corrections' *Kansas Advisory Jail Standards and Procedures* (March 1985) in its analysis of minimum standards, and would recommend the same to the defendants for their calculations. The Court has also referred to the American Correctional Association's *Standards for Adult Local Detention Facilities*, Second Edition. Any plan that the defendants present to the Court for its approval will be weighed against these reference works. The Court does not intend to be coy in its general reference to these publications as comprising constitutional standards; it is well known that constitutional standards for jails are *minimum* standards, and that many things which may be decent or humane are nonetheless not constitutionally required. This Court is empowered only to order the facility brought up to minimum constitutional standards, and that is all it will require for approval of the County's proposed plan.

Because the situation at the jail has continued for so long, a requirement of staying the injunction is that this proposal be before this Court no later than March 2, 1987. Frankly, that is longer than the Court considers necessary for the development of such a proposal. However, the Court is aware of the political situation at the Sedgwick County Commission. On January 12, 1987, three new commissioners take office for a four year term, and they will comprise a majority of the expanded five person commission. The Court believes that they should have input into the proposal. Therefore, the proposal due date will be delayed until after they have taken office. If the County Commission, both as the present three-member body and as the incoming five-member body, feels that this time is insufficient for development of a proposal, the Court suggests that the new Commissioners-elect be consulted now. The situation at the jail is bad enough, and has gone on long enough, that the Court will not be receptive to a motion for an extension of time of the due date for any but the most compelling of reasons. After the County has presented its proposal, counsel for the plaintiffs will be given three weeks in which to study and review

the proposal, and file any comments it deems pertinent regarding the proposal with the Court. Such filing shall be made no later than March 23, 1987. The County will be allowed to reply to plaintiffs' filing, if it deems a reply necessary, by March 30, 1987. Thereafter, the Court will schedule a hearing on the proposal if the Court determines that such a hearing is necessary.

If the County presents a proposal to this Court by March 2, 1987, and if the proposal to bring the Sedgwick County Jail facilities into constitutional compliance meets with the Court's approval, barring unforeseen circumstances the Court will continue the stay of its injunction for so long as progress on implementing the County's proposal continues at a reasonable pace.

### B. Population Cap

Assuming that the County presents a thoroughly acceptable proposal to this Court on March 2, 1987, and that work is begun promptly on bringing the facilities into compliance with constitutional requirements pursuant to that proposal, it will still most likely be 1989 before Sedgwick County prisoners are being housed in a constitutional facility. While the Court may be willing to stay its injunction against the operation of an unconstitutional facility until that time, it is not willing to allow the continued unaltered operation of the jail. As this opinion has demonstrated, prisoners are currently warehoused in that facility in numbers as much as three times greater than should be allowed. In thirty cells, four inmates are packed like sardines into a space as small as seven feet by ten feet. From that small space, the inmates must deduct the space occupied by their bunks (taking into consideration that bunks are double stacked), and frequently the space occupied by a toilet and/or a shower. Constitutional considerations aside, these conditions do not comport with anyone's notion of humane, twentieth century conditions. Indeed, so appalling are the crowded conditions that the Court is frankly amazed that the Sedgwick County Jail has not been the site of protests or uprisings by the inmates. While the fact that these potentially incendiary conditions have not

erupted is a tribute to the prisoners themselves and to the Sheriff's Department officers who operate the facility, there is no guarantee that this powder keg will remain unexploded.

But there is a countervailing consideration, which was aptly stated by the Court in *Anderson v. Redman*, 429 F.Supp. 1105 (D.Del.1977):

Against this picture of [the jail] as a ticking time bomb must be weighed the fact that the inmates are convicted criminals, and in order to reduce the prison population to even emergency capacity involves certain risks. The difficulty of this balancing is compounded because it weighs the certainty of potentially undesirable, but perhaps minimal consequences of ordering interim reduction against the uncertainty of inaction with a potential for disastrous consequences. Putting aside for the moment the right of a prisoner to proper housing and right of a correctional officer to relatively safe working conditions, the remaining interest at stake is the right of the citizens of Delaware to be secure in their persons and property. The issue is whether an order to reduce the inmate population immediately to emergency capacity thereby limiting the possibility of random escapes by dangerous inmates better serves these citizens than an order which permits the present threat of a riot to continue with the concomitant possibility of a mass escape. Although the release of any inmate involves certain risks, those released pursuant to a controlled reduction are the least likely to present a threat to society.

*Id.* at 1127.

It was consideration of these types of factors that led the Court to its decision to stay enforcement of its injunction against operation of the jail in an unconstitutional condition, subject to the conditions enumerated above. Consideration of these factors has also led the Court to conclude that the jail cannot be allowed to continue to operate at its present capacity. Therefore, during the pendency of the County's develop-

ment of a proposal to bring its jail facilities within constitutional requirements, it will only be allowed to operate the existing facilities subject to a population cap. The details of that cap are as follows.

Kansas Department of Correction standards as delineated in the *Kansas Advisory Jail Standards and Procedures* requires the following regarding space available to inmates:

§ 32.05 EXISTING AND NEW PLANT. All single rooms or cells with a capacity of two or less in detention facilities have at least sixty (60) square feet of floor space per inmate when immediate access to a day room is provided. When access to a day room is not provided there is to be at least seventy (70) square feet of floor space per inmate. (Jail/Lockup) *Necessary.*

§ 33.01 EXISTING AND NEW PLANT. Multi-occupancy cells house no less than three (3) inmates in each and are used for inmates classified as minimum or medium security only. Such cells shall provide a minimum of fifty (50) square feet per inmate. (Jail/Lockup) *Necessary.*

§ 34.02 EXISTING. Space outside the cell or room should be provided for inmate exercise. (Jail) *Desirable.*

It goes without saying that the Sedgwick County Jail does not meet these criteria. While the Court will not yet require them to be met, it will require that the following interim space requirements be met. The County will be excused for now from the requirement to provide day room/exercise space, although the Court reserves the right to require such space be made available later if it appears that the continued denial of such space to the inmates is detrimental to their physical well being. However, the County will be required to provide approximately seventy-five per cent of the above space requirements to the inmates. Those *target* figures are:

a. Single cell, day room provided—45 sq. ft. per inmate.

b. Single cell, no day room provided—52.5 sq. ft. per inmate.

c. Multi cell, day room provided—37.5 sq. ft. per inmate.

d. Multi cell, no day room provided—45 sq. ft. per inmate.

(The standards do not have separate requirements for multi cells when no day room is provided. However, in such instances, the Court determined that 37.5 square feet was insufficient space for multi celled inmates. Therefore, this category was created by the Court to accommodate multi celled inmates who have no additional room available to them.)

Because calculating these figures by taking the total area available in the jail divided by the total inmate population would not insure that each inmate would have the necessary area, the Court has calculated the maximum number of inmates to be allowed in *each cell* within the existing jail. Attached to this opinion as Exhibit A is a map of the Sedgwick County Jail provided by the Kansas Department of Corrections. Written in each cell is the number of bunks placed in that cell (total 327 bunks). A figure in a circle indicates the square feet of that cell. The Sheriff's office has, at the Court's request, checked these figures and corrected them where necessary. Their corrected figure is also written in a circle, and can be distinguished from the original figure in that the Sheriff's figures are written with a finer pen, and unlike the original figures they place both the number and the words "sq. ft." inside the circle. (Attached to this opinion as Exhibit B is a map provided by the Sheriff's office indicating the actual dimensions of the cells.) The figure written inside a square is the Kansas Department of Correction's indication of how many inmates should be allowed in that cell. Finally, the Court has numbered each cell for discussion purposes. Those numbers are written in triangles to distinguish them from all other numbers. The holding cells outside the elevators, which are only used to hold prisoners being transported to court or elsewhere, are not numbered.

In the chart following, the Court lists the cell numbers and their classification, a-d, referring to the above listed size definitions. The maximum number of inmates to be allowed in each cell is then indicated.

The total number at the far left merely indicates the total for all cells listed on that line. When particular designations need additional discussion, an asterisk by the cell number will indicate that a discussion on that cell follows the chart.

### SEDGWICK COUNTY JAIL
### MAXIMUM OCCUPANCY LIMITS

| Cell number | Classification | Maximum per cell | Total |
|---|---|---|---|
| **\* FOURTH FLOOR** | | | |
| 1–2 | b | 1 | 2 |
| 3 | c | 4 | 4 |
| 4–6 | a | 2 | 6 |
| 7–8 | a | 2 | 4 |
| 9–12 | b | 1 | 4 |
| 13 | Isolation cell, not for permanent housing | | |
| **FIFTH FLOOR** | | | |
| 1 | d | 3 | 3 |
| 2–3 | b | 1 | 2 |
| 4 | d | 4 | 4 |
| 5–8 | b | 1 | 4 |
| 9 | b | 1 | 1 |
| 10 | b | 2 | 2 |
| *11 | d | 5 | 5 |
| *12 | d | 7 | 7 |
| 13 | d | 4 | 4 |
| *14–16 | b | 1 | 3 |
| 17 | b | 1 | 1 |
| 18–19 | Isolation cells, not for permanent housing | | |
| **\* SIXTH THROUGH EIGHTH FLOORS** | | | |
| 1–2 | Isolation cells, not for permanent housing | | |
| 3–5 | b | 1 | 3 |
| 6 | d | 9 | 9 |
| *7–16 | b | 2 | 20 |
| 17 | d | 7 | 7 |
| *18 | d | 5 | 5 |
| *19 | d | 3 | 3 |

### NOTES

FOURTH FLOOR: This floor is the women's floor for the jail. Even though only one of the five floors is designated for women, the number of women in the jail consistently is less than one-fifth of the total population. Consequently, female inmates have more space available to them than male inmates do. That is why the fourth floor only still uses its day rooms as day rooms.

FIFTH FLOOR: *Cells 11 & 12.* Because the bunks are typically double stacked, an odd number of bunks takes up no less floor space than one additional bunk would. This generally does not concern the Court; it is more concerned with space for inmates than with space for bunks. Cells 11 & 12's mathematical calculations would indicate that they should have five and seven bunks respectively. But since cells 11 and 12 are interconnected, the Court recommends that instead of placing five bunks in one cell and seven in the other, six bunks be placed in each cell. This will create more floor space in total, and not infringe upon the allocated floor space per inmate. If jail officials for security or other reasons must keep the cells separated from each other during the daytime hours, and not open the block containing these two cells, then the indicated number of bunks must be placed in the respective cells.

FIFTH FLOOR: *Cells 14—16.* These cells are classified as a "b" cell, which means they should provide 52.5 square feet per inmate. But these cells are the smallest cells in the jail, they only have 37—39 square feet in them. Because the Court recognizes that this population ceiling will cause a dramatic reduction in the number of inmates that can be incarcerated at the Sedgwick County Jail, it will not further exacerbate the problem by requiring that these cells be kept vacant. But it does require, as a part of this order, that no single inmate be incarcerated in these cells for more than fifteen consecutive days.

SIXTH THROUGH EIGHT FLOORS: The floor plan of these three floors is virtually identical, although for some reason cells seem to get progressively larger as one moves to higher floors. But the space differences are minimal. Therefore, the Court treats the three floors as one, rather than repeat the list three times. The totals given in the far left column represent only one floor's totals, not totals for all three floors.

SIXTH—EIGHT: *Cells 7—16.* The area of these ten cells on the three floors range from 72—80 square feet. They are classified as "b" cells, which means they should provide 52.5 square feet per inmate. Therefore their mathematical calculation

yields a factor of 1.37 to 1.52 inmates. Because the cells have no apparent difference in size, the Court determines that it would be ridiculous to put one inmate in the cells factoring 1.37 to 1.49, and two inmates in the remaining cells. Having determined to place an identical number of inmates in all cells, the Court decides that the cells can each house two. Although pure mathematics would recommend rounding *down* for a consistent result in this instance, to do so would reduce the number of inmates allowed in the jail by an additional thirty. The Court is not willing to so further reduce the population ceiling of the jail at this time.

SIXTH—EIGHT: *Cells 18—19.* Currently, the room which the Court has marked as Cell 19 is actually the only room in the men's portion of the jail available as a day room (actually three are available: one on each floor). Because all other day rooms have been converted to dormitories, the Court has calculated this one as if it also will be used to house inmates. If the prison officials are for any reason unwilling or unable to convert cell 19 into a housing cell, then cell 18 would be reclassified as a "c" cell, as it would have a day room available. In that instance, it would be entitled to six bunks instead of the five indicated. Alternatively, if both cells are used for housing, four bunks may be placed in each cell instead of the five and three indicated, for the reasons and under the conditions previously discussed for cells 11 and 12 on the Fifth Floor.

The above population ceiling restrictions will result in a maximum inmate population at the jail of 191 to 197 inmates (Fourth Floor, twenty; Fifth Floor, thirty-six; Sixth through Eighth Floors, forty-five to forty-seven, depending on the arrangement of cells 18 and 19). The Sheriff's office will be required to remove from all cells the bunks in excess of the maximum number of inmates allowed for that cell. Existing bunks may be kept in the isolation cells, although they were not included in the total count. In the event that the Sheriff determines that community safety requires the detention of people in excess of the maximum number indicated, he will be al-

lowed to exceed the above established limits for a period not to exceed 72 hours upon his certification in writing that concerns for community safety require the detention of excess people. That certification must be filed with the Court no later than one week after the day on which the ceiling was first exceeded, along with an indication of how many excess inmates were detained, and how long the excess lasted. Excess inmates may not be bedded on the floors. The Sheriff's department must move in additional bunks sufficient for the number of excess inmates. Once the crisis has passed, the additional bunks must be removed.

The defendants will be given sixty days from the date of this order in which to bring the Sedgwick County Jail facilities into compliance with the above limitations. After that date, they may not exceed the limitations except upon the emergency conditions indicated above. The Court will not indicate how the population is to be reduced; such determinations are the province of the state judiciary and relevant county officers, not of this Court. This Court will suggest that defendants investigate such methods as continued transfer of prisoners to other facilities; release on their own recognizance of those pretrial detainees held on default of low level bonds; and probation of inmates incarcerated for low level, non violent offenses.

The Court bases these recommendations upon information contained in a report submitted by defendants that, of the surrounding seventeen county jails which Sedgwick County has used to house county prisoners in the past, those counties' combined jail capacities exceed their average population by 200 inmates; of all inmates incarcerated in the Sedgwick County Jail, approximately half are pretrial detainees; and 22% of the inmates in the Sedgwick County Jail are there on low level misdemeanor charges—C misdemeanors or city misdemeanors (such as tampering with a landmark, theft of cable television services or unlawful hunting). Arnold, *The Sedgwick County Jail: An Inmate Population Study, supra* at 34. The County has also

operated its jail to house prisoners for other jurisdictions. Only about three-fifths of the inmates incarcerated in the Sedgwick County Jail are county prisoners. A little more than one-third are city prisoners, and five to ten percent are federal prisoners. *Id.* at 17. However, the Court notes these options merely as suggestions. Actual individual determinations of which inmates may be dealt with in what manner will be properly left to the appropriate state and county authorities.

While this interim ceiling causes a substantial reduction in the capacity of the jail, it should not be confused with what constitutional requirements for jail facilities actually are. Not only has the Court settled on a temporarily lower level of space requirements, but it has not required for now that activity rooms be made available. If progress on bringing county facilities within constitutional parameters is not made promptly, this Court reserves the right to modify its ceiling order later on to require such changes as making activity space available. Specifically, the Court would probably require as a minimum that the following cells be vacated and restored to day room status: Fifth Floor, cell 12, Sixth through Eighth Floors, cells 6, 17, and 19.

## C. Special Master

The Court finds that the exceptional circumstances of this case—the declaration of unconstitutionality and the interim relief ordered—warrant the appointment of a special master to monitor the defendants' efforts to comply with its Order. It is clear that federal courts have the power to appoint agents to supervise the implementation of their decrees, and that the appointment of special masters in prison cases is an expeditious method of assisting courts in overseeing remedial action. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1161 (5th Cir.1982). The special master shall report on the county's compliance with the Court's decree and assist with implementation of that decree. The master shall make sporadic, unannounced visits to the jail to observe conditions there (such as heating, cooling, lighting, noise levels, ventilation, and plumbing) and shall report his observa-

tions to this Court. To that end, the master may also report inmate complaints to both the jail administrators and to this Court. However, the master is not to intervene in the daily operation of the jail, since the master is an arm of the Court. The Court will, of course, take into consideration the master's reports in determining the propriety of or necessity for further relief. The Court shall appoint United States Marshall Eddie De Herrera as its special master.

## D. Reporting

Because the Court is conditioning the continued stay of its injunction upon the County's compliance with certain restrictions, and because the stay of the injunction results in the continued operation of an unconstitutional facility, the Court will require that it be kept informed of the ongoing conditions of the jail. In part, this will be accomplished by the reports which the Court will receive from its special master. But for some conditions the Court will require daily information, and this information must be provided to the Court by the County.

The County will be required to keep a temperature log of the daily temperatures on each floor. The temperature reports are to be taken at 7:00 a.m. and at 4:00 p.m. These logs are to be filed with the Court on the first and the third Monday of each month, for so long as the Court continues to stay its injunction.

The County is also required to keep a daily log of the number of prisoners incarcerated in each cell. The log should identify the cells by the numbers used for them in Appendix A of this Opinion and Order. For each day, the log should indicate the highest number of prisoners incarcerated in each cell that day. Although the County is not required to comply with the Court-ordered ceiling until sixty days from the date of this Order, reporting is to begin immediately. These logs are also to be filed with the Court on the first and third Monday of each month for so long as the Court continues to stay its injunction.

## IV. JUVENILE PARTIAL SUMMARY JUDGMENT MOTION

Also before the Court is plaintiff's motion for partial summary judgment, which seeks an order preventing defendants from continuing to place juveniles in the Sedgwick County Jail. While the motion may have some merit, the Court has received no affidavits nor conducted evidentiary hearings on this issue, and is therefore unable to grant the plaintiff summary judgment on this issue. Plaintiff's reply memorandum itself acknowledges that controverted facts exist. Dk. 91, p. 1. It is elementary law that the existence of controverted, material facts precludes the granting of summary judgment. *See supra* Section I.

It may be that methods employed by the defendants to comply with the jail population ceiling imposed by this Court earlier in this opinion will moot this particular motion. If not, plaintiff must come forward with evidence to support such a motion before it may be considered by the Court.

## V. SUMMARY

This Opinion and Order addresses an action of long standing before this Court. Even older than this case, though, is the problem of overcrowding at the Sedgwick County Jail which this case addresses. From the inception of this case, both sides have worked with each other and with the Court in a spirit of cooperation and candidness. The Court recognizes that this matter is one of intense public debate, one of those proverbial "hot political issues" which could have been the subject of obstructive tactics and public posturing by both sides, and the Court appreciates that neither side has chosen that route. The Court further recognizes that the county officials have attempted to fashion a solution to this problem on several occasions. By this Order, the Court means only to encourage them in that endeavor, not to thwart their intentions or constrain their actions in any way.

As the Court has stressed throughout this Opinion, it is not the Court's intention to require the County to build a new jail or to otherwise make any capital expenditures. Such decisions are not the province of the courts. But this Court does have an obligation to enjoin unconstitutional conditions at the jail. While the Court recognizes that the effect of its decision herein may be to require the County to ultimately make capital expenditures of some nature, that mere fact cannot allow the Court to shirk its duty. The overcrowded conditions at the Sedgwick County Jail are egregious and demand judicial intervention.

There is no significant disagreement on the underlying facts found or noted by the Court herein from either the elected officials of the County or their counsel. They have been forthright concerning that. From the Court's observation of public comment in the press and the news accounts and editorials concerning this situation, there is also no significant dissent on these facts. While press items are rarely evidentiary in character, a recent cartoon published during the preperation of this Opinion by the *Wichita Eagle Beacon* on Wednesday, November 26, 1986, portrays most graphically the root cause of the legal issues raised by conditions at the Jail. That cartoon is attached as Exhibit C. It is the problems arising from this undisputed overcrowding that mandate the Court's Order today.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment is hereby granted, the current operation and condition of the Sedgwick County Jail are found by the Court to be violative of the due process clause of the Fifth and Fourteenth Amendments and of the cruel and unusual punishment clause of the Eight Amendment, and the Sedgwick County Jail is hereby declared unconstitutional.

IT IS FURTHER ORDERED that defendants are hereby enjoined from the continued operation of the Sedgwick County Jail in its current, unconstitutional condition.

IT IS FURTHER ORDERED that the enforcement of this injunction is hereby stayed upon the following conditions. The defendants shall present to this Court by March 2, 1987, a proposal for bringing the

Sedgwick County Jail facilities within constitutional parameters. Plaintiffs will be given until March 23, 1987, to respond to this proposal, and defendants will be given until March 30, 1987, to reply to plaintiffs' response. Thereafter, defendants must proceed with reasonable speed to implement that proposal once it is approved by the Court. Defendants shall within sixty days from the date of this Order reduce the total population of the jail to comply with the maximum population limitations detailed previously in this Opinion. The Court's special master must be given access to the jail as he requests for inspection and reports to the Court; and the County shall log daily temperature readings and cell populations, and file such logs with the Court semi-monthly, pursuant to the standards detailed above.

IT IS FURTHER ORDERED that Eddie De Herrera is appointed as the Court's special master for this case.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment seeking an order prohibiting the defendants from housing juveniles in the jail is hereby denied.

IT IS FURTHER ORDERED that when the new county commissioners take office, the Clerk of the Court is directed to substitute the new commissioners for the departing commissioners pursuant to the automatic substitution procedures provided in Rule 25(d) of the Federal Rules of Civil Procedure.

EXHIBIT A

II

SIX-BUNKS

TWO-BUNKS

TWO-BUNKS

SIX-BUNKS

STORAGE

SUPPLY

SUPPLY

SUPPLY

SUPPLY

SUPPLY

TWO-BUNKS

Two-Bunk

Two-Bunk

Two Bunk

Two Bunks

Two Bunks

FIRE EXIT

FIRE EXIT

ONE-BUNK

TWO-BUNKS

TWO-BUNKS

TWO-BUNKS

TEN BUNKS

DAY ROOM

EIGHT BUNKS

EIGHTEEN-BUNKS

N

FLOOR PLAN   FIFTH FLOOR

TOTAL CAPACITY = 67
(Fifth floor)

Lt. Clifford L. Withhouse

III

IV

FLOOR PLAN SIXTH—SEVENTH—EIGHTH—FLOORS

TOTAL CAPACITY = 75 (per floor)
RECOMMENDED = 18

TOTAL CAPACITY = 75 (per floor)
RECOMMENDED = 18

FLOOR PLAN SIXTH - SEVENTH - EIGHTH - FLOORS
[] = Recommended Capacity per cell

EXHIBIT B

I

DATE: 11-13-86

Measurements Taken By: Sgt. Clifford Miller, D0058

Detention Officer Edwin Simpson, D0353

FLOOR PLAN FOURTH FLOOR

○ Indicates Number of Beds In Each Cell

Measurements Taken By: _____ ; Detention Officer Edwin Simpson, D0353

Sgt. Clifford Miller, D0058

FLOOR PLAN FIFTH FLOOR

SCALE NONE

◯ Indicates Number Of Beds In Each Cell

III

Measurements Taken By: ~~Sgt. Charles Ames~~ Detention Officer Edwin Simpson, DO353
Sgt. Clifford Miller, DO058

FLOOR PLAN  6th Floor

Scc: ½" = 1'-0"

◯ Indicates Number Of Beds In Each Cell

IV.

Measurements Taken By: Sgt. Clifford Miller, D0058, Detention Officer Edwin Simpson, D0353

FLOOR PLAN 7th Floor.

○ Indicates Number Of Beds In Each Cell

V.

Measurements Taken By: Sgt. Clifford Miller, D0058
Detention Officer Edwin Simpson

FLOOR PLAN   8th Floor.

○   Indicates Number Of Beds In Each Cell

EXHIBIT C